# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TIMOTHY FITZGERALD TENNILLE,

        Defendant-Appellant.

FOR PUBLICATION
April 14, 2016
9:00 a.m.

No. 323059
Wayne Circuit Court
LC No. 14-001678-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SEAN DANIEL RUTLEDGE,

        Defendant-Appellant.

No. 323314
Wayne Circuit Court
LC No. 14-001679-FC

---

Before: SHAPIRO, P.J., and O'CONNELL and GLEICHER, JJ.

GLEICHER, J.

Defendants jointly stood trial for the murder of Charles Whitfield. A jury convicted both of first-degree murder, MCL 750.316, and possession of a firearm during the commission of a felony, MCL 750.227b. Defendants contend that their convictions are tainted by the prosecutor's use of peremptory challenges to strike five African-American jurors in contravention of *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986). Each also raises evidentiary challenges. We find defendants' *Batson* argument potentially dispositive and remand for proceedings consistent with this opinion.

I

When an attorney raises a *Batson* objection, the trial court must determine whether purposeful discrimination motivated the strike. A well-known three-step process guides this inquiry. If the defendant establishes a prima facie case of racial discrimination, the burden shifts to the prosecutor to offer race-neutral explanations for his or her exercise of peremptory

-1-

challenges. *Id.* at 97. Once the prosecutor has made that proffer, the defendant may argue that the stated reasons are pretextual. The trial court then resolves the challenge by determining whether the defendant has established purposeful discrimination. *Id.* at 98.

Sometimes, the prosecutor's race-neutral reason for striking a minority juror is rooted in the juror's demeanor during voir dire interrogation. The trial court must then evaluate "whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder v Louisiana*, 552 US 472, 477; 128 S Ct 1203; 170 L Ed 2d 175 (2008). This question is inherently factual.

Here, defense counsel raised a *Batson* challenge when the prosecutor peremptorily excused two African-American jurors. When defense counsel objected, the prosecutor asserted that he exercised the strikes based solely on the jurors' demeanors rather than their responses to questioning. The trial court accepted the prosecutor's explanation as "a valid race neutral reason," but made no factual findings regarding the jurors' appearances, the prosecutor's credibility, or whether defendants established purposeful discrimination. Because the trial court made no factual findings and the record does not permit a reliable evidentiary hearing, we must remand for an evidentiary hearing conducted pursuant to the strict guidelines we set forth in this opinion. If the necessary facts cannot be determined with confidence, the trial court must vacate defendants' convictions and retry them.

II

The voir dire of defendants' jury began on June 30, 2014, with the trial judge's announcement: "I do all the voir dire." The initial 14 venire members seated in the jury box included juror number seven, WB. In response to the court's request for basic background information, WB offered that she lived in Detroit and attended "school for paralegal and I intern at Michigan Legal Services. No children."

During a follow-up round of questioning, the court focused on relationships with attorneys and law enforcement personnel. Juror number 5, JG, volunteered that he was "[c]lose friends" with a Michigan state trooper. He conceded that this friendship might prevent him from "being fair and impartial to both sides," and apologized for feeling "biased toward the police in this case." When asked whether he would "automatically believe someone just because their [sic] police officers," JG answered, "99.9 percent, probably." After a few more court-crafted questions aimed at mitigating this patent partiality, JG admitted that he would "probably" "be leaning towards the police." He vowed to "try" to follow an instruction to judge the credibility of a police officer in the same manner as he would judge the credibility of other witnesses. He then added:

> My natural bias is I've had extremely good experience with law enforcement. Extremely good. I live in Dearborn. My experience there is top notch. Where I come from, originally, up north my experience has been very, very good. I was raised to have tremendous respect for them. It was a field I considered going into at one point myself.

The trial court turned to juror number six, who indicated that his son was a police officer but affirmed that he could nonetheless be "fair and impartial to both sides." The court then addressed prospective juror WB:

> *The Court*: Anyone else? Juror seven?
>
> *Prospective Juror*: My cousin's a lawyer.
>
> *The Court*: Your cousin? And you're studying to be a paralegal right now? Do they practice criminal law, civil law?
>
> *Prospective Juror*: Real estate.
>
> *The Court*: So, they don't have anything to do with criminal law then?
>
> *Prospective Juror*: No.
>
> *The Court*: You promise not to call them up and ask them their opinion about this case?
>
> *Prospective Juror*: I promise.
>
> *The Court*: Have you taken any criminal justice or criminal law courses in your paralegal studies?
>
> *Prospective Juror*: Yes.
>
> *The Court*: Do you understand I'm giving the instructions in this case?
>
> *Prospective Juror*: Yes.
>
> *The Court*: You have to follow the instructions as I give them to you; do you understand that? You might have heard something different in one of your classes. You're going to follow what I say right?
>
> *Prospective Juror*: Yes.
>
> *The Court*: And would anything you heard in your classes would that impact your ability to be fair and impartial to both sides in this case?
>
> *Prospective Juror*: No.

That concluded WB's voir dire.

Before the close of the first day, the court excused JG for cause. The voir dire continued the next morning with the seating of replacement jurors in several empty positions. Prospective juror DC filled seat number five. The court requested that the new jurors "tell us about yourself, what you do for a living, your spouse does for a living, if you have children or grandchildren, what city you live in." DC responded that she was "divorced/single," lived in Detroit, had two

grown children, and had retired from her city of Detroit position as an "[a]dministrative assistant." When asked whether the new jurors had served on a jury before, DC responded that she had been on a criminal jury that reached a verdict twenty years ago. She spoke no further.

At the next opportunity for challenges (ten transcript pages after DC's response), the prosecutor exercised peremptory strikes of WB and DC. Defense counsel immediately asked to approach the bench. According to the transcript, a "[b]rief sidebar" ensued. The court then stated: "Jurors 5 and 7, you're excused from this jury." Voir dire continued for several more hours.

After the jury was selected (at approximately 3:00 p.m.), the court returned to the *Batson* challenge "that was raised" but "never got placed on the record." Here is the colloquy:

> *The Court*: . . . So, during jury selection, jury voir dire, I believe it was Mr. Harris [counsel for Rutledge] raised a <u>Batson</u> challenge with regard to the challenge of Jurors 5 and 7, which were, I believe [DC] and [WB], both of whom were African American females.

> *Mr. Harris:* Yes. I know that this Court, your Honor, is familiar with <u>Batson</u>, <u>People</u> versus <u>Batson</u>.

> * * *

> Your Honor, I made my objection based on the fact that the Prosecutor had, previous to that, excluded three other African Americans off of the jury pool. Or off of the - - used their Peremptory to excuse three other jurors, three other African American jurors.

> And then decided that they were going to use their Peremptories to exclude two other African American female jurors. And so I objected based on <u>Batson</u>.

> I know that this Court knows the rule. I know the Prosecutor knows that you can't use race as a basis for eliminating a particular juror.

> And it was apparent to me, given those exclusions, that that's what the Prosecutor was trying to do.

> *The Court*: And the Prosecutor gave reasons for excusing Jurors 5 and 7 when the challenge was raise [sic].

> And Mr. Prosecutor?

> *The Prosecutor*: Yes, Judge. The reason and of course People know of <u>People</u> v <u>Batson</u>. We understand that jurors cannot be excluded on the basis of race, even though the Defense excused many non-African Americans.

-4-

I believe the Prosecutor excused African Americans, as well as non-African Americans. There was no pattern.

The reason that those two jurors were excluded was because during the voir dire period there was [sic] questions about whether or not jurors would accept police testimony.

And . . . potential juror . . . indicated that he would believe a [sic] police testimony, almost to a fault. And that he would take what they said - - he would give their testimony more credence than he would a normal witness.

Judge, that's something that we all wish would not be a jurors' [sic] perspective. But those two - - those potential jurors, the ones who were excluded, their reaction to his statements were just over the top, in showing disgust for his answers.

Judge, based on that, I don't know if they had anything against police and prosecutors, in general.

Most people reacted in some way. But those two jurors' reactions were excessive. To the point where my officer in charge pointed it out to me. And just further solidified what I had in my own mind

And it was my choice to excuse them based on that. It had nothing to do with race, Judge.

*The Court*: And I accepted that as a valid race neutral reason. And therefore, I denied the <u>Batson</u> challenge.

III

Under the first step of a *Batson* challenge, a defendant must make a prima facie showing that (1) he or she is a member of a particular racial group, (2) the prosecution used a peremptory challenge to exclude from the jury a member of that racial group, and (3) circumstances raise an inference that the challenge was race based. *Batson*, 476 US at 96. Defendants met this burden. Defendants are African American, as are WB and DC. And defendants contended that the prosecution's use of five total peremptory challenges to eliminate potential African-American jurors raised an inference of racial motivation. Indeed, the prosecution does not dispute that defendants established a prima facie case of discrimination.

Our focus therefore falls on the second and third steps of the *Batson* analysis. An appellate court reviews de novo *Batson*'s second step, which centers on whether the prosecutor set forth a race-neutral explanation for the strikes. *People v Knight*, 473 Mich 324, 343; 701 NW2d 715 (2005). The third step in the *Batson* analysis requires the trial court to determine whether the challenger has sustained his burden of demonstrating a racial motivation for the challenged peremptory strikes. This constitutes a question of fact reviewed for clear error. *Id*. at 344. This standard of review derives from *Hernandez v New York*, 500 US 352, 364; 111 S Ct 1859; 114 L Ed 2d 395 (1991), in which the United States Supreme Court explained that *Batson*

treated "intent to discriminate as a pure issue of fact, subject to review under a deferential standard[.]"

## IV

Based on our review of the record, we discern that the trial court committed two serious *Batson* errors. First, the court failed to afford defense counsel an opportunity to rebut the prosecutor's stated reason for dismissing jurors DC and WB. Second, the trial court's abbreviated ruling ("And I accepted [the prosecutor's explanation] as a valid race neutral reason. And therefore, I denied the *Batson* challenge") evinces that the trial court misapprehended its role. Merely stating that a prosecutor has articulated a valid, race-neutral reason for his strikes does not suffice under *Batson*. Rather, a court must make some findings of fact regarding whether the prosecutor's justification for the strikes seems credible under all of the relevant circumstances, including whether the jurors actually exhibited the expressions claimed and whether the averred reactions were the real reasons for the strikes. This record contains no factual findings whatsoever. Rather, the trial court improperly conflated steps two and three of the *Batson* framework, thereby failing to reach step three at all.

## A

*Batson*'s first step examines whether the facts and circumstances of the voir dire suggest that racial discrimination motivated a strike. Evidence raising merely an inference of discrimination surmounts the first *Batson* step, creating a prima facie case. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U S at 359; see also *People v Bell*, 473 Mich 275, 296; 702 NW2d 128, mod 474 Mich 1201 (2005). As noted, the prosecutor volunteered an explanation for the strikes and therefore step one of the analysis falls away. We move to steps two and three, which are intended to resolve whether discriminatory purpose actually animated the peremptory challenges.

In step two of the *Batson* framework, "[t]he prosecutor . . . must articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 US at 98. Step two obliges the prosecutor to "give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Id*. at 98 n 20 (quotation marks and citation omitted). Our Supreme Court has elucidated that the inquiry at the second step is narrow:

> [A]t *Batson*'s second step, a court is only concerned with whether the proffered reason violates the Equal Protection Clause as a matter of law. See, e.g., *United States v Uwaezhoke*, 995 F2d 388, 392 (CA 3, 1993) ("Thus, if the government's explanation does not, on its face, discriminate on the basis of race, then we must find that the explanation passes *Batson* muster as a matter of law, and we pass to the third step of *Batson* analysis to determine whether the race-neutral and facially valid reason was, as a matter of fact, a mere pretext for actual discriminatory intent."). [*Knight*, 473 Mich at 344.]

-6-

*Batson*'s second step does not demand articulation of a persuasive reason, or even a plausible one; "so long as the reason is not inherently discriminatory, it suffices." *Rice v Collins*, 546 US 333, 338; 126 S Ct 969; 163 L Ed 2d 824 (2006), citing *Purkett v Elem*, 514 US 765, 767-768; 115 S Ct 1769; 131 L Ed 2d 834 (1995).

Here, the prosecutor provided a single race-neutral explanation for challenging both WB and DC: that they reacted "in showing disgust" for JG's insistence "that he would believe a [sic] police testimony, almost to a fault. And that he would take what they said - - he would give their testimony more credence than he would a normal witness."[1] The prosecutor's stated reason for dismissing the two jurors—their response to another juror's answers regarding police credibility—qualifies as race neutral.

*Batson*'s third step requires the trial court to make a final determination of whether the challenger of the strike has established purposeful discrimination. *Batson*, 476 US at 98. In *Miller-El v Cockrell*, 537 US 322, 338-339; 123 S Ct 1029; 154 L Ed 2d 931 (2003), the United States Supreme Court emphasized that "the critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike. . . . [T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible." The Court provided several measures of credibility: "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id*. at 339. In making a finding at step three, the trial court is required to assess the plausibility of the race-neutral explanation "in light of *all* evidence with a bearing on it." *Miller-El v Dretke*, 545 US 231, 251-252; 125 S Ct 2317; 162 L Ed 2d 196 (2005) (emphasis added).

Step three is critical to *Batson*'s analytical process. When a court finds that a prosecutor has articulated a race-neutral ground for a peremptory challenge, the court must then determine whether the strike is nonetheless discriminatory. "It is inappropriate for a district court to perfunctorily accept a race-neutral explanation without engaging in further investigation." *United States v Jackson*, 347 F3d 598, 605 (CA 6, 2003). "[A]sking whether something is race-neutral is analytically distinct from determining whether the asserted reason is believable or pretextual." *United States v Rutledge*, 648 F3d 555, 560 (CA 7, 2011). Rather, at step three, the trial court must undertake to find facts. Our standard of review for this stage reflects the necessity of fact-finding. In *Knight*, 473 Mich at 344, our Supreme Court specifically held that *Batson*'s third step presents questions of fact "reviewed for clear error."

B

When a prosecutor's sole explanation for a strike resides in a juror's appearance or behavior, the third step bears heightened significance. Explanations for peremptory challenges based solely on a juror's demeanor "are particularly susceptible to serving as pretexts for

---

[1] These are the prosecutor's words. The trial court subsequently excused JG for cause, explaining that "as I continued to question him he seemed to be more and more hesitant he would be able to be fair and impartial with regard to police testimony."

discrimination." *Harris v Hardy*, 680 F3d 942, 965 (CA 7, 2012). "Nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike. For that reason, trial courts must carefully examine such rationales." *Davis v Fisk Electric Co*, 268 SW3d 508, 518 (Tex, 2008). "[B]ecause such after-the-fact rationalizations are susceptible to abuse, a prosecutor's reason for discharge bottomed on demeanor evidence deserves particularly careful scrutiny." *Brown v Kelly*, 973 F2d 116, 121 (CA 2, 1992).

In *Snyder*, 552 US at 477, the United States Supreme Court expounded on the trial court's central role in discerning whether discriminatory animus has motivated a strike premised in part on a juror's expressions, attitude, or comportment. As in this case, *Snyder* involved a peremptory challenge based on a prospective juror's demeanor. The juror in question, Mr. Brooks, was a college student and otherwise fully qualified to sit. The prosecutor explained that he challenged Brooks because "he looked very nervous to me throughout the questioning." The prosecutor then added a second reason for the strike: that jury service might cause Mr. Brooks to miss essential student-teaching time, thereby encouraging him to render a swift not-guilty verdict. *Id*. at 478. Defense counsel disputed both reasons and the trial court ruled: " 'All right. I'm going [to] allow the challenge[.]' " *Id*. at 479.

The Supreme Court carefully examined the record and determined that the prosecutor's second reason, flowing from the juror's college commitments, was "suspicious" and "implausib[le]." *Id*. at 483. As to Brooks's "nervousness," the Court observed that while " 'nervousness cannot be shown from a cold transcript,' " the trial court record "does not show that the trial judge actually made a determination concerning Mr. Brooks'[s] demeanor." *Id*. at 479. The Court acknowledged that "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's first-hand observations of even greater importance." *Id.* at 477. The Court continued: "In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id*.

In applying these precepts to the facts of the case before it, the Supreme Court observed that "the trial judge simply allowed the challenge without explanation," elaborating:

> It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks' demeanor. Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned. Thus, the trial judge may not have recalled Mr. Brooks'[s] demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks'[s] demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous. [*Id*. at 479.]

Because the prosecutor's first reason for striking Mr. Brooks was pretextual, the Court refused to presume based on an empty record that the prosecutor's fallback position—Mr. Brook's "nervousness"—merited automatic acceptance. As nearly a decade had passed since Snyder's

conviction, the Court reversed his conviction rather than remanding for fact finding. *Id*. at 485-486.

The *Batson* issue in this case also hinges on step three. The Supreme Court highlighted in *Snyder* that at *Batson*'s third step, "The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Id.* at 477. Here, the record is devoid of factual findings. Immediately after the prosecutor stated his reason for the strikes, the court deemed the reason race neutral. This ruling addressed only step two: whether the prosecutor's explanation for the peremptory challenges was race neutral. The court made no effort to entertain argument from defense counsel regarding whether the strike was racially motivated despite the prosecutor's articulation of a race-neutral ground. Nor did the court reference any argument on that score that had been made during the unrecorded "side-bar conference," or that the court had considered that question. Instead, the court decisively stated that it "accepted" the prosecutor's explanation as "a valid race neutral reason" and denied the challenge. This premature conclusion of the *Batson* inquiry reflects that the trial court misapprehended defense counsel's role in the *Batson* process and overlooked the inalterable need for factual findings.

In conducting a *Batson* analysis, a court may not simply "accept" a prosecutor's race-neutral explanation and terminate the inquiry there. Rather, the trial court is tasked with engaging in a more penetrating analysis focused on ascertaining whether the prosecutor's proffered race-neutral reason is pretext intended to mask discrimination. Evaluation of this central question requires the court to permit argument by defense counsel, who bears the burden of persuading the court that the prosecutor purposefully discriminated when exercising the strike. *Purkett*, 514 US at 768. After affording the opponent of the challenge an opportunity to argue that the prosecutor's stated reason lacks credibility in light of all surrounding circumstances, the court must render findings focused on the prosecutor's demeanor when making the argument, whether the prosecutor's explanation is reasonable and probable, and "whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v Cockrell*, 537 US at 339. Where demeanor serves as the sole ground for dismissal, some indication of whether the court observed the alleged expressions is required. If the court did not see the expressions, it must nonetheless find facts that either support or refute that racial discrimination motivated the challenge. This fact finding hinges largely on credibility.

This record lacks any objective indicia of the prosecutor's credibility regarding the extent of the jurors' reactions or the manner in which they compared to the reactions of other jurors. The absence of factual findings in this regard is compelling evidence that the trial court short-circuited the *Batson* process by failing to subject the prosecutor's demeanor claim to a dispassionate evaluation.

In *Thaler v Haynes*, 559 US 43, 48; 130 S Ct 1171; 175 L Ed 2d 1003 (2010), a habeas corpus proceeding, the Supreme Court issued a brief per curiam opinion holding that the trial court's inability to personally observe a juror's demeanor does not necessarily require rejection of a prosecutor's demeanor-based explanation. The central question in that case was whether the United States Court of Appeals for the Fifth Circuit had correctly applied the deference to state court judgments required under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28

USC § 2254. The Supreme Court rejected the Fifth Circuit's ruling that it could not afford AEDPA deference to state appellate court rulings " 'because the state courts engaged in pure appellate fact-finding for an issue that turns entirely on demeanor.' " *Id.* at 46, quoting *Haynes v Quarterman*, 561 F3d 535, 541 (CA 5, 2009). The Supreme Court disagreed, explaining that "no decision of this Court clearly establishes the categorical rule" that a trial judge's inability to verify a juror's reaction or behavior requires rejection of the challenge. *Haynes*, 559 US at 49.[2] Indeed, *Snyder* was decided six years before Haynes was convicted. Nonetheless, the trial judge's " 'firsthand observations' " remain "of great importance." *Id.* (citation omitted). Similarly, "the best evidence of the intent of the attorney exercising a strike is often that *attorney's* demeanor." *Id.* (emphasis added).

This case is governed by *Snyder*, not *Haynes*. Nothing in the record suggests that the trial court made any factual findings at *Batson* step three. Even if the trial court did not personally observe the jurors' reactions, the court "has a pivotal role" in evaluating whether the prosecutor's demeanor, and any pertinent surrounding circumstances, belie that a strike was race neutral. Fact finding was particularly important in this case, as the demeanor explanation for the prosecutor's challenges, standing alone and uninformed by additional facts, bears careful scrutiny.

Assuming that jurors DC and WB did react in noticeable ways to JG's inappropriate answers, their reactions do not necessarily support a logical inference that they harbored an anti-prosecution bias. Their disdain for JG's statements was reasonable given that the trial court dismissed JG for cause. Indeed, the prosecutor admitted: "I don't know if they had anything against police and prosecutors, in general. Most people reacted in some way." This is a telling admission. The challenged jurors' negative reaction to JG's unwillingness to shed his bias in favor of police officers might have been viewed by the trial court as appropriate to the situation. Without the benefit of more information and factual findings, we cannot simply accept that the alleged *extent* of the two jurors' reactions legitimately disqualified them from service. Even if they displayed more pronounced feelings than those revealed by others who shared them, it does not necessarily follow that they would be less disposed than other reacting jurors to accept the prosecutor's proofs. The prosecutor offered no explanation for this logical leap, and we perceive of none, especially in a factual vacuum.

Alternatively stated, this record does not permit a conclusion that the prosecutor's stated reason for the strikes was nondiscriminatory, as the behaviors the prosecutor relied on do not call into question the jurors' abilities to be fair and impartial. Their answers to the limited questioning revealed no bias. These women were not sleeping, nervous, preoccupied, hostile, angry, bored, disrespectful, or agitated. They did not fail to make eye contact. Rather, their reactions were reasonable and shared by other jurors.

---

[2] In *Haynes*, two different judges presided over the voir dire. The Supreme Court noted that in *Snyder*, "the judge who presided over the *voir dire* also ruled on the *Batson* objections, and thus we had no occasion to consider how *Batson* applies when different judges preside over these two stages of the jury selection process." *Haynes*, 559 US at 48.

Without benefit of any pertinent facts of record, this case cannot be meaningfully distinguished from *Snyder*. There, as here, the trial judge made no factual determination of the jurors' demeanors, and "we cannot presume that the trial judge credited the prosecutor's assertion" that the jurors reacted in a certain fashion. *Snyder*, 552 US at 479. There, as here, the prosecutor's explanation for peremptorily excusing the two jurors was implausible even if the jurors demonstrated strong disapproval of juror five's views as strong disapproval was warranted, demonstrated by the trial court's decision to remove JG from the jury.[3]

Moreover, because one of the two challenged jurors (DC) was seated in the public area of the courtroom during JG's colloquy with the court and not the jury box, it is questionable whether the trial court witnessed her alleged reaction. Indeed, it is unlikely that defense counsel saw it either. The prosecutor indicated that he missed it, too; he explained that his demeanor-based strike of DC rested on information supplied by "my officer in charge" rather than first-hand observation. Given this hazy factual background regarding DC and the extent of her actual reaction to JG's statements, the prosecutor's credibility in making the strikes was highly significant. Potentially, so was that of the "officer in charge."

The record provides no reassurance that the trial court even thought about whether the prosecutor's stated reason for the strikes was his real reason. As the prosecutor had already challenged three African-American jurors, it was incumbent on the judge to determine through record fact finding that the challenges of WB and DC were not the products of impermissible discrimination. The trial court made no effort to demonstrate that it understood or applied *Batson*'s third step, or that it made any reasoned determination whether the strikes of WB and DC were motivated by impermissible discrimination. The court's perfunctory ruling on step two is not equivalent to the thoughtful analysis *Batson* demands on step three. The Supreme Court's admonition in *Snyder* bears repeating:

> [R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. [*Snyder*, 552 US at 477.]

V

---

[3] The United States Supreme Court has observed that a prosecutor's " 'failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.' " *Miller-El v Dretke*, 545 US at 246, quoting *Ex parte Travis*, 776 So 2d 874, 881 (Ala, 2000). Here, the trial court permitted no voir dire. Whether or not the two challenged jurors harbored biases justifying their challenge was not fleshed out during the voir dire conducted by the trial court. And the failure of the trial court to make any factual findings regarding these jurors compounded the problem the court created by conducting the voir dire on its own.

This case was tried in June 2014. Almost two years have elapsed since the voir dire. We note that the United States Supreme Court has yet to definitely decide whether in circumstances such as this, remand rather than reversal is required. In the interest of judicial economy, we will remand to the trial court for an evidentiary hearing during which the trial court must conduct the third-step analysis it omitted at defendant's trial.

At *Batson*'s third step, the trial judge must evaluate the plausibility of the prosecutor's race-neutral explanation for a strike "in light of all evidence with a bearing on it." *Miller-El v Dretke*, 545 US at 251. This inquiry necessarily includes careful consideration of relevant direct and circumstantial evidence of intent to discriminate. *Batson*, 476 US at 83. Furthermore, *Batson* requires that defense counsel be afforded an opportunity to argue on the record that the prosecutor's reasons for the strikes were pretextual. We acknowledge that "if *Batson* is to be given its full effect, trial courts must make precise and difficult inquiries to determine if the proffered reasons for a peremptory strike are the race-neutral reasons they purport to be, or if they are merely a pretext for that which *Batson* forbids." *Coombs v Diguglielmo*, 616 F3d 255, 264 (CA 3, 2010).

Given the passage of time, we are not confident that any of the trial participants will be able to summon actual memories of the facial expressions of the challenged jurors *and* those of the jurors in the venire *and* those seated in the jury box *and* the prosecutor's credibility at the time he argued against the *Batson* challenge.[4] Additional relevant facts include: the number of minority jurors in the jury box at the time of the strikes, the number of minority jurors on the final jury, the prosecutor's demeanor and credibility at the time he made the strikes, and the credibility of the "officer in charge." This case presents a formidable evidentiary gap. It remains to be seen whether that gap can be confidently and reliably filled on remand. Nevertheless, "our concern for judicial economy persuades us that allowing the [trial] judge the opportunity for such findings is the correct course." *United States v McMath*, 559 F3d 657, 666 (CA 7, 2009).

However, "if the passage of time has made such a determination impossible or unsatisfactory," *Dolphy v Mantello*, 552 F3d 236, 240 (CA 2, 2009), the court must grant defendants a new trial. We highlight that our remand order is not an invitation to prevarication or post hoc rationalizations. Nor may the prosecutor offer new reasons for striking the two challenged jurors. We will not affirm based on an incomplete hearing or findings that suggest uncertainty, contrivance or dissembling. Furthermore, we order that the trial court commence remand proceedings forthwith, and under no circumstances in more than 30 days from the date of the issuance of this opinion.

If the trial court concludes that defendants proved purposeful discrimination or if the court is unable to reach a conclusion because of the passage of time, defendants' convictions must be vacated and a new trial ordered.

---

[4] If any nonminority jurors reacted in an equivalent manner and wound up seated on defendants' jury, the prosecutor's stated reason for his strikes of DC and WB could be regarded as pretextual.

We remand for an evidentiary hearing in conformity with this opinion.  We retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Douglas B. Shapiro

# Court of Appeals, State of Michigan

## ORDER

People v Tennille; People v Rutledge

Douglas B. Shapiro
Presiding Judge

Docket No.    323059; 323314

Peter D. O'Connell

LC No.    14-001678-FC; 14-001679-FC

Elizabeth L. Gleicher
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 30 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, the circuit court must conduct a hearing pursuant to *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), and make factual findings on the record. The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

APR 14 2016
Date

Chief Clerk