*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 30, 2019

Plaintiff-Appellee,

v

No. 341245
Genesee Circuit Court
LC No. 17-041439-FC

JACOBIE ELIZA HALL,

Defendant-Appellant.

Before: TUKEL, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of four counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a); MCL 750.520b(2)(b), and four counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a); MCL 750.520c(2)(b). The trial court sentenced defendant to concurrent terms of 25 to 40 years' imprisonment for his CSC-I convictions and 10 to 15 years' imprisonment for his CSC-II convictions. Defendant appeals as of right, and we affirm.

Defendant's convictions arise from his sexual abuse of his best friend's younger sister. The abuse began when the victim was seven or eight years old, and it continued until she disclosed the abuse to her mother when she was 11 years old. At trial, the victim described numerous instances of sexual penetration and sexual conduct perpetrated on her by defendant. In an interview with police, defendant admitted to inappropriate touching and sexual acts with the victim, and defendant acknowledged that police might find his DNA as a result of his most recent sexual contact with the victim. Forensic testing revealed the possible presence of seminal fluid and male DNA on the victim's underwear, as well as possible male DNA on swabs from the victim's sexual assault kit. Subsequent DNA testing on the victim's underwear provided "very strong support" for the conclusion that defendant contributed the male DNA insofar as it was determined to be 580,000 times more likely that the mixture of DNA in the victim's underwear came from defendant and the victim rather than someone else and the victim. A jury convicted defendant, as noted earlier.

# I. *BATSON* CHALLENGE

On appeal, defendant argues that the prosecutor used peremptory challenges to systematically exclude African-Americans from the jury without valid, race-neutral reasons. Defendant maintains that the trial court incorrectly applied *Batson*[1] by failing to consider whether the prosecutor's stated reasons were pretextual and by improperly considering the number of African-Americans on the final jury. We disagree.

"[A] prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried." *Batson*, 476 US at 89 (citations omitted). However, "[u]nder the Equal Protection Clause of the Fourteenth Amendment, a party may not exercise a peremptory challenge to remove a prospective juror solely on the basis of the person's race." *People v Knight*, 473 Mich 324, 335; 701 NW2d 715 (2005).

Under *Batson*, the constitutional propriety of a peremptory challenge involves application of a three-step process. *Id*. at 336. First, the defendant must make a prima facie showing of discrimination by demonstrating that "(1) the defendant is a member of a cognizable racial group; (2) peremptory challenges are being exercised to exclude members of a certain racial group from the jury pool; and (3) the circumstances raise an inference that the exclusion was based on race." *People v Bell*, 473 Mich 275, 282-283; 702 NW2d 128 (2005), mod 474 Mich 1201 (2005). "Second, if the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike." *Knight*, 473 Mich at 337. "While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character." *Hernandez v New York*, 500 US 352, 362-363; 111 S Ct 1859; 114 L Ed 2d 395 (1991) (plurality opinion) (citation omitted). Third, "if the proponent provides a race-neutral explanation as a matter of law, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination." *Knight*, 473 Mich at 337-338.

The applicable standard of review depends on which step of the process is at issue.

If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext

---

[1] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error. [*Id*. at 345.]

"[T]he trial court's ultimate factual finding is accorded great deference." *Id*. at 344.

## A. APPLICATION

In this case, it is undisputed that defendant is African-American and that the prosecutor dismissed four prospective African-American jurors; defendant raised a *Batson* challenge in the trial court regarding three of the dismissed prospective jurors. After the prosecutor explained the reasons for exercising peremptory challenges, and after defense counsel responded to the prosecutor's assertions, the trial court rejected defendant's *Batson* challenge. The trial court stated that it was not "persuaded that there's anything that's racially motivated here." Instead, the trial court concluded that the prosecutor "had a legitimate reason" for her challenges. In rejecting defendant's claim of improper racial motivation, the trial court also emphasized that there were three or four African-Americans on the jury which was seated.

On appeal, both parties assert that the trial court failed to faithfully adhere to the three-step *Batson* process for assessing the constitutional propriety of a peremptory challenge. The prosecutor alleges that the trial court skipped over the first step by failing to address whether defendant made a prima facie showing of discrimination, and defendant maintains that the trial court failed to consider the third step, i.e., whether the prosecutor's stated reasons were pretextual.

Considering the *Batson* steps in order, the prosecutor is correct that the trial court did not address the first step insofar as the trial court failed to consider whether defendant made a prima facie showing of discrimination. However, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 US at 359 (plurality opinion); see also *Bell*, 473 Mich at 296-297. Thus, while the prosecutor on appeal disputes the adequacy of the trial court's analysis of the first step, in the trial court "the prosecutor volunteered an explanation for the strikes, and therefore step one of the analysis falls away." *People v Tennille*, 315 Mich App 51, 63; 888 NW2d 278 (2016). Having conceded the first step in the trial court, the prosecutor cannot now ask this Court to determine that defendant failed to make a prima facie showing of discrimination. Instead, the issue before us on appeal involves an analysis of the application of steps two and three. See *id*. at 62-63.

With regard to step two, the trial court did not err by concluding that the prosecutor offered race-neutral reasons for excusing the jurors in question. "[A]t *Batson*'s second step, a court is only concerned with whether the proffered reason violates the Equal Protection Clause as a matter of law." *Knight*, 473 Mich at 344. "*Batson*'s second step does not demand articulation of a persuasive reason, or even a plausible one; so long as the reason is not inherently discriminatory, it suffices." *Tennille*, 315 Mich App at 63 (quotation marks and citation omitted). None of the prosecutor's proffered reasons was inherently discriminatory.

-3-

According to the prosecutor, she dismissed the first juror because the prospective juror was a defense attorney, and the two of them "had a case together." Concerns regarding occupation are race neutral.[2] See *Smulls v Roper*, 535 F3d 853, 862 (CA 8, 2008). The prosecutor's stated reason for dismissing the second juror, TM, was his act of glaring at the prosecutor over his sunglasses while she asked questions; hostile facial expressions are considered a race-neutral justification for a juror strike. See *Barfield v Orange Co*, 911 F2d 644, 648 (CA 11, 1990); *United States v Power*, 881 F2d 733, 740 (CA 9, 1989). The third juror, DA, was dismissed because the prosecutor thought she was staring into space and appeared inattentive, but "[a] prosecutor is justified in striking jurors that he or she perceives to be inattentive or uninterested." *United States v Garrison*, 849 F2d 103, 106 (CA 4, 1988); see also *Power*, 881 F2d at 740; *United States v Terrazas-Carrasco*, 861 F2d 93, 94 (CA 5, 1988). The fourth juror, SC, was dismissed for her blue hair and a misspelling on the jury questionnaire, which the prosecutor perceived as indicative of a poor education. Blue hair is not a characteristic of any particular race, and race-neutral concerns involving a juror's appearance, including hair, are a nondiscriminatory reason for a strike. See *Purkett v Elem*, 514 US 765, 769; 115 S Ct 1769; 131 L Ed 2d 834 (1995). Likewise, education and, even more specifically, misspellings on a juror card have been considered race-neutral justifications for striking a juror. See, e.g., *United States v Marin*, 7 F3d 679, 686-687 (CA 7, 1993). Therefore, for purposes of *Batson*'s second step, the prosecutor articulated race-neutral reasons for dismissing the jurors in question.

Finally, "[a]t *Batson*'s third step, the trial judge must evaluate the plausibility of the prosecutor's race-neutral explanation for a strike in light of all evidence with a bearing on it." *Tennille*, 315 Mich App at 73 (quotation marks and citation omitted). "When a prosecutor's sole explanation for a strike resides in a juror's appearance or behavior, the third step bears heightened significance." *Id*. at 65. "[A] court may not simply 'accept' a prosecutor's race-neutral explanation and terminate the inquiry there. Rather, the trial court is tasked with engaging in a more penetrating analysis focused on ascertaining whether the prosecutor's proffered race-neutral reason is pretext intended to mask discrimination." *Id*. at 68. "Furthermore, *Batson* requires that defense counsel be afforded an opportunity to argue on the record that the prosecutor's reasons for the strikes were pretextual." *Id*. at 73. The trial court's inquiry at step three "necessarily includes careful consideration of relevant direct and circumstantial evidence of intent to discriminate," *id*., including analysis of whether the jurors behaved as alleged by the prosecutor and consideration of the prosecutor's credibility, *id*. at 68-69. Additional relevant facts may include the number of minority jurors in the jury box at the time of the strikes and the number of minority jurors on the final jury. *Id*. at 74.[3]

---

[2] At trial, defense counsel stated that she had "no problem" with the dismissal of this juror, and defendant does not specifically object to this juror's dismissal on appeal. Nevertheless, to the extent her dismissal can arguably be considered part of an alleged pattern of discriminatory dismissal by the prosecutor, this juror should be considered when applying *Batson*. See *Knight*, 473 Mich at 346.

[3] The composition of the venire before and after the exercise of strikes is relevant to the determination of discriminatory intent. Indeed, even if "there is a showing that the prosecution

In this case, defendant asserts that the trial court conflated steps two and three by categorizing the prosecutor's reasons as legitimate without engaging in an analysis of whether the reasons were pretextual. Admittedly, the trial court could have done a better job of articulating its findings and conclusions regarding step three on the record. See *Knight*, 473 Mich at 338-339. However, in the absence of such a clear articulation by the trial court, "an appellate court must determine on the basis of a fair reading of the record what the trial court has found and ruled," even though "[t]his is not the preferred route." *Id.* at 339. Here, the record fairly read demonstrates that the trial court analyzed the question of pretext as required by step three. That is, contrary to the dissent's contention, the trial court did not simply accept the prosecutor's stated reasons and end the *Batson* inquiry. Instead, as required in step three, the trial court also afforded defense counsel an opportunity to respond and to argue that the prosecutor's reasons were a pretext. Defense counsel in response only addressed two of the jurors, stating that she did not notice the one juror "glowering over his sunglasses" or the other juror "staring off into space." In other words, defendant essentially challenged the factual bases for the prosecutor's use of the peremptory strikes as to those two jurors. After hearing from both parties, the trial court stated, "I'm not, uh, persuaded that there's anything that's racially motivated here" and "I think [the prosecutor] had a legitimate reason." Because the trial court entertained competing arguments on the jurors' behavior and the question of pretext, the trial court clearly understood its role and, in crediting the prosecutor's reasons as "legitimate," the trial court made a reasoned determination that the prosecutor's strikes were, in fact, not racially motivated and therefore not pretextual.[4]

---

used all its peremptory challenges to exclude" African-Americans, focusing only on that fact "does not take into account considerations that may be very relevant, including the percentage of the racial group in the district jury pool or original jury; the pattern of strikes exercised by the defense; the number of strikes available to the government; and the composition of the ultimate jury sworn." *United States v Sangineto-Miranda*, 859 F2d 1501, 1521 (CA 6, 1988). As an example, if a particular jury pool was 80% African-American, it would not be notable if a prosecutor used the majority of its peremptory challenges on African-Americans. Additionally, "[i]f there are minority members on the jury but the prosecutor did not use all its peremptory challenges, that would be a factor tending to refute discrimination." *Id*. at 1522. "However, if all the prosecutor's challenges were used, that fact would point toward an inference of discrimination." *Id*.

[4] *Tennille* is readily distinguishable from our case because in *Tennille*, after the prosecutor provided his reasons for the peremptory strikes, the trial court simply stated, "And I accept that as a valid race neutral reason. And therefore, I denied the *Batson* challenge." *Tennille*, 315 Mich App at 61. The *Tennille* Court noted that the record provided "no reassurance that the trial court even thought about whether the prosecutor's stated reason for the strikes was his real reason." *Id*. at 72. However, in the instant case, the trial court did more than merely "accept" that the prosecutor put forth race-neutral reasons; importantly, the trial court expressly found those reasons credible, thereby satisfying the third step of the *Batson* analysis.

Further, before rejecting defendant's claim of improper racial motivation, the trial court also considered the circumstances surrounding the prosecutor's exercise of peremptory challenges, including the fact that the final jury included three or four African-American jurors. While defendant claims that the final jury composition is irrelevant, it is a proper consideration when addressing a *Batson* challenge, see *id.* at 74 and note 3 of this opinion, particularly when, as in this case, the prosecutor has peremptory challenges remaining and yet members of the protected group in question were part of the final jury. See *People v Williams*, 174 Mich App 132, 137; 435 NW2d 469 (1989); *Marin*, 7 F3d at 686. Ultimately, while the trial court's factual findings were not long or detailed, the trial court fulfilled its obligations under step three of the analysis when it considered the parties' arguments as well as the circumstances bearing on the prosecutor's credibility and expressly determined that there was no improper racial motivation.

Because, after having given defense counsel an opportunity to rebut the prosecution's asserted reasons, the trial court found that those reasons were not racially motivated, we need only determine whether the trial court's factual findings were clearly erroneous. See MCR 2.613(C); *Knight*, 473 Mich at 345. In doing so, "regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). Indeed, as previously indicated, we are to afford the trial court's ultimate factual finding "great deference." *Knight*, 473 Mich at 344.

Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v City of Bessemer City, NC*, 470 US 564, 574; 105 S Ct 1504; 84 L Ed 2d 518 (1985); see also *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463, 486; 719 NW2d 19 (2006). Here, with nothing on the record to indicate otherwise, there were two permissible views of the evidence—either the prosecutor's explanations were pretextual or they were sincere. The trial court, of course, found the explanations truthful, and thus non-discriminatory. By definition, therefore, the trial court's factual determination regarding the genuineness of the prosecutor's explanations could not be clearly erroneous.

Accordingly, we hold that the trial court did not err in finding no *Batson* violation.

## B. LACK OF VOIR DIRE

We take this opportunity to address the dissent's emphasis on the fact that the prosecution engaged in little or no voir dire regarding two of the three jurors at issue. Citing *Miller-El v Dretke*, 545 US 231, 246; 125 S Ct 2317; 162 L Ed 2d 196 (2005), the dissent states that "a prosecutor's 'failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.' " The dissent then claims that "while SC was voir dired, there was nothing in her examination to indicate that she was not able to serve as a capable juror." But this ignores the premise for the use of the peremptory strike: the prosecutor did not assert that she exercised the peremptory challenge based on anything possibly having to do with SC's views, per se, which could be explored in voir dire, but rather due to her bright blue hair and misspellings on her juror questionnaire. Everyone concerned, including the dissent, acknowledge that SC had blue hair and made the misspellings. "[A] prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view

-6-

concerning the outcome of the case to be tried . . . ." *Batson*, 476 US at 89 (quotation marks and citation omitted), and "[t]here are any number of bases on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause." *Id.* at 98 n 20 (quotation marks and citation omitted). In doing so, "the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Id.* (quotation marks and citation omitted).

The prosecutor gave such a clear explanation here, citing the undisputed, objective facts of SC's blue hair and misspellings. Simply put, some, perhaps many, people are put-off and are skeptical of a person of any race who chooses to wear blue hair; many other people are not at all offended by such a practice. Nonetheless, the practice is itself race neutral, and thus a trial lawyer's lack of confidence in selecting such a person as a juror is not a racially motivated factor. With the possible exception of *Tennille*, nothing in *Batson* or any other case requires a prosecutor to ask a prospective juror questions regarding objectively proven, non-racially based facts which give the lawyer pause; that is particularly so where, as here, asking such a prospective juror why she chooses to color her hair blue or why she misspelled simple words could yield no additional relevant information. Similarly, a trial lawyer is not required to pose questions about a juror's misspellings, also an objectively proven and race-neutral factor, knowing that the answer could not yield any useful information. Furthermore, such questioning related to hair color or misspelling carries the risk of embarrassing the potential juror in front of the other jurors, which could lead to alienating those other jurors against the questioner. Thus, as to SC, there simply was no "meaningful voir dire examination" that could have been undertaken to delve into the reasons given for striking her. While the dissent may be correct that there was nothing in the examination of SC to show that she was not able to serve as a capable juror, this ignores that "the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause[.]" *Hernandez*, 500 US at 362-363. Thus, the lack of voir dire is irrelevant to the striking of SC; the only issue is whether the prosecutor truthfully set forth the reason for the strike.

Similarly, the dissent notes that there were no voir dire questions posed to TM. However, the reason for which the prosecutor struck TM—wearing sunglasses, glaring over them, and glaring at the prosecutor—also were not amenable to voir dire. It is undisputed that defense counsel agreed that TM was wearing sunglasses, as counsel stated that she did not see TM glaring *over* the sunglasses. As with the unusual choice of hair color, the wearing of sunglasses indoors and in court, on its own, even without a direct finding regarding the alleged glaring, was a sufficient nonracial basis for the exercise of the peremptory challenge. And again, counsel was not required to ask questions about such conduct in voir dire; the reason itself was racially neutral, and given that it was undisputed that TM was wearing sunglasses, the prosecutor was not required to ask questions which could possibly alienate other jurors.

And finally, as to DA, the prosecutor stated, "Uh, your Honor, when we were asking questions, she was kind of staring off into space and not really paying attention and, uh, if they're not paying attention during voir dire, they're not gonna pay attention during trial." Again, there is nothing about being inattentive which could be explicated by voir dire. Defense counsel did state that she did not see DA staring off into space, but defense counsel did not point to a juror of another race who could be claimed to have been inattentive but whom the prosecution did not strike; and, as noted, the trial court stated that it found nothing racially

motivated in the strike. We thus discern no basis for rejecting the trial court's finding that the strike was permissible.

## II. STATEMENT OF A PARTY-OPPONENT

Defendant also argues that he was denied a fair trial by the admission of a statement defendant made to the victim about the possibility of his having sex with the victim's friend.[5] Over defendant's objection, the trial court allowed introduction of the statement as an admission of a party-opponent under MRE 801(d)(2)(A). On appeal, defendant argues that the statement fell under MRE 404(b) and was therefore inadmissible because the prosecutor failed to provide the notice required by MRE 404(b)(2). Defendant also argues that the statement was irrelevant and unduly prejudicial insofar as it suggested that defendant had a sexual proclivity toward young girls.

At the outset, we note that defendant only challenges the admission of his conversation with the victim, and accordingly his reliance on MRE 404(b) is misplaced. MRE 404(b) applies to evidence of "other crimes, wrongs, or acts." Generally speaking, a defendant's prior statement is not subject to MRE 404(b) because it "is just that—a statement, not a prior act." *People v Goddard*, 429 Mich 505, 518; 418 NW2d 881 (1988); see also *People v Rushlow*, 179 Mich App 172, 176; 445 NW2d 222 (1989), aff'd 437 Mich 149 (1991). More specifically, the *Goddard* Court held that "[a] statement of general intent is not a prior act for purposes of MRE 404(b)." *Goddard*, 429 Mich at 514-515. In this case, in his conversation with the victim, defendant expressed an interest in having sex with the victim's friend, and this mere verbal expression of general intent is not subject to MRE 404(b). See *id*. at 514-515, 518. Because MRE 404(b) does not apply, it also follows that defendant's MRE 404(b)(2) notice argument is without merit because MRE 404(b)(2) is inapplicable to defendant's conversation with the victim.

Instead, as noted, the trial court admitted defendant's remark under MRE 801(d)(2)(A) as a statement of a party-opponent. "As the statement of a party opponent, the admissibility analysis involves instead first determining whether the statement was relevant, and second whether its probative value outweighed its possible prejudicial effect." *Goddard*, 429 Mich at 515. We question the relevance of a statement about defendant's interest in having sex with someone other than the victim and whether the prejudicial effect of this lustful disposition evidence outweighed its probative value. See generally *People v Sabin (After Remand)*, 463 Mich 43, 68; 614 NW2d 888 (2000); *People v Engelman*, 434 Mich 204, 222; 453 NW2d 656 (1990).

Nevertheless, even if the trial court abused its discretion by admitting defendant's statement, defendant would not be entitled to relief because any error was harmless in light of the overwhelming evidence of defendant's guilt. "When we find error in the admission of evidence, a preserved nonconstitutional error 'is presumed not to be a ground for reversal unless it

---

[5] Although defendant expressed a sexual interest in the victim's friend, there is no evidence that he committed any sexual offense against the girl in question.

affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict.' " *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017), quoting *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014). "[R]eversal is only required 'if such an error is prejudicial'; in this context, 'prejudicial' means that, after examining the error and 'assess[ing] its effect in light of the weight and strength of the untainted evidence . . . it affirmatively appears that the error asserted undermine[s] the reliability of the verdict.' " *People v Snyder*, 301 Mich App 99, 111-112; 835 NW2d 608 (2013), quoting *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). Such an analysis " 'focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence,' " in order " 'to determine whether it is more probable than not that a different outcome would have resulted without the error.' " *Denson*, 500 Mich at 396-397, quoting *Lukity*, 460 Mich at 495.

Under these circumstances, it is clear that even absent the admission of defendant's statement to his friend, a jury would have found defendant guilty. The victim testified at trial, describing in detail numerous acts of sexual assault perpetrated on her by defendant. The victim's testimony was corroborated by the forensic examination of the sexual assault kit, which revealed the presence of seminal fluid and male DNA in her underwear. DNA test results very strongly supported the conclusion that defendant contributed the male DNA in the underwear. Moreover, in his statements to police, defendant incriminated himself by admitting to inappropriate touching with the victim, including the fact that he went to the victim's room in the middle of the night and that he rubbed her vagina with his hand. Considering the weight and strength of the properly admitted evidence, it is highly unlikely that any error in the admission of defendant's statement affected the outcome of trial. Accordingly, defendant is not entitled to relief on appeal.

## III. ADMISSION OF TRANSCRIPTS

Next, defendant argues that the trial court abused its discretion by admitting a transcript of his interview with police. Defendant argues that use of the transcript violated the best-evidence rule and impermissibly invaded the province of the jury. We disagree.

Initially, it should be emphasized that the trial court admitted both the recording itself *and* a transcript of the recording. Because the recording itself was admitted, defendant's arguments regarding the best-evidence rule are without merit. Specifically, MRE 1002 states, "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute." Under this rule, defendant is correct that the recording itself was required to prove its contents, but defendant's argument nevertheless fails because the prosecutor complied with MRE 1002 by introducing the recording at trial. When offered in conjunction with the recording, the transcript functions as an aid to the jury, similar to the use of "photographs, drawings, maps, or mechanical models." *People v Karalla*, 35 Mich App 541, 546-547; 192 NW2d 676 (1971).

Bearing in mind that the transcript was not offered as a replacement for the recording, the admission of the transcript was not categorically precluded by the existence of a recording. See *id*. Instead, when considering the presentation of the transcript to the jury, the relevant question before the trial court was whether the transcript was accurate. See *People v Lester*, 172 Mich

App 769, 776; 432 NW2d 433 (1988), citing *United States v Robinson*, 707 F2d 872, 878-879 (CA 6, 1983). In this case, we note that the trial court did not specifically consider the accuracy of the transcript in the manner suggested in *Lester*. Nevertheless, defendant is not entitled to reversal of his convictions. In particular, although defendant contests the jury's consideration of the transcript, he has not identified any inaccuracies in the transcript as compared to the recording. See *United States v King*, 272 F3d 366, 372 (CA 6, 2001). Further, contrary to defendant's claim that the transcript improperly invaded the province of the jury, the jury had the chance to independently verify the transcript's accuracy by comparing the transcript to the recording, which was played in court. A police officer also testified at trial, describing the interview with defendant, and the jury was thus able to assess the recording and transcript to assess witness credibility. See *United States v Wilkinson*, 53 F3d 757, 762 (CA 6, 1995). Additionally, there was substantial evidence of defendant's guilt apart from defendant's interview with police, including the victim's testimony about defendant's sexual abuse, which was corroborated by the strong forensic support for the conclusion that defendant's DNA was in the victim's underwear. On these facts, given that the recording itself was properly admitted, even assuming error existed with respect to the admission of the transcript, it does not appear more probable than not that any potential error affected the outcome of the trial in light of the weight and strength of the properly admitted evidence. See *People v Benton*, 294 Mich App 191, 199; 817 NW2d 599 (2011). Accordingly, defendant is not entitled to any relief.[6]

## IV. "CONTAMINATED" EVIDENCE

In a Standard 4 brief, defendant also argues that several of the prosecutor's exhibits— including the sexual assault kit, bedding from the victim's room, and the victim's nightgown— were contaminated by police officers' handling of the items and that these items should not have been admitted into evidence because the contamination rendered DNA testing unreliable. Defendant also contends that defense counsel provided ineffective assistance by failing to object to the admission of this evidence. We disagree.

Defendant's evidentiary claim is unpreserved, and unpreserved claims are reviewed for plain error affecting substantial rights. See *People v Houston*, 261 Mich App 463, 466; 683 NW2d 192 (2004). Defendant has not shown plain error. The admission of real evidence requires an adequate foundation to establish that the object in question was involved in the crime

---

[6] In contesting the admission of the transcript, defendant also makes the unpreserved argument that the transcript constitutes hearsay from the transcriptionist in the form of a statement by the transcriptionist offered to prove what defendant said during his interview with police. Even assuming that the transcript constitutes hearsay for which an exception does not apply, defendant cannot show that the admission of the transcript affected the outcome of the proceedings when the recording of his interrogation was properly admitted at trial, defendant has failed to identify any discrepancy between the transcript and the recording, and defendant's incriminating statement was corroborated by the victim's testimony of his sexual abuse as well as strong forensic support for the conclusion that defendant's DNA was in the victim's underwear. See *People v Houston*, 261 Mich App 463, 466; 683 NW2d 192 (2004).

and that the " 'condition of the object is substantially unchanged.' " *People v White*, 208 Mich App 126, 130; 527 NW2d 34 (1994) (citation omitted).

> "If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition. On the other hand, if the offered evidence is of such a nature as not to be readily identifiable, or to be susceptible to alteration by tampering or contamination, sound exercise of the trial court's discretion may require a substantially more elaborate foundation. A foundation of the latter sort will commonly entail testimonially tracing the 'chain of custody' of the item with sufficient completeness to render it reasonably probable that the original item has neither been exchanged with another nor been contaminated or tampered with." [*Id*., quoting 2 McCormick, Evidence (4th ed), § 212, pp 7-8.]

While a foundation must be laid, "the admission of real evidence does not require a perfect chain of custody." *White*, 208 Mich App at 130. Instead, "any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility once the proffered evidence is shown to a reasonable degree of certainty to be what its proponent claims." *Id*. at 130-131.

In this case, defendant claims that the prosecutor's exhibits were inadmissible because they were contaminated by police and that, therefore, DNA testing on the items was unreliable. However, defendant's claim of contamination relates to the fact that police officers handled some of the evidence *at trial*, in the courtroom, without wearing gloves. While this may have been imprudent, it did not render the evidence inadmissible. Significantly, by the time of trial, the DNA testing on the underwear already had been completed, and contrary to defendant's arguments, any handling of the evidence by police during trial could not possibly have affected the DNA results. Further, the prosecutor's witnesses testified to a chain of custody before trial that established a foundation for the admission of the CSC kit and the items collected from the victim's room. Consequently, defendant has not shown plain error in the admission of this evidence. Additionally, because the prosecutor laid a proper foundation for the admission of the evidence, an objection by defense counsel on the basis of contamination would have been futile. Accordingly, defendant's ineffective assistance claim is also without merit because defense counsel cannot be considered ineffective for failing to make a meritless objection. See *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

## V. LEADING QUESTIONS

Finally, in his Standard 4 brief, defendant argues that the trial court erred by denying defendant's objections to the prosecutor's use of leading questions during direct examination of the victim. We disagree.

"Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." MRE 611(d)(1). Whether to allow leading questions is within the trial court's discretion. *People v Garland*, 152 Mich App 301, 309; 393 NW2d 896 (1986); see also MCL 768.24 ("Within the discretion of the court no

question asked of a witness shall be deemed objectionable solely because it is leading."). However, "a considerable amount of leeway may be given to a prosecutor to ask leading questions of child witnesses." *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001). Moreover, "[i]n order to demonstrate that reversal is warranted for the prosecution asking leading questions, it is necessary to show some prejudice or patterns of eliciting inadmissible testimony." *People v Johnson*, 315 Mich App 163, 200; 889 NW2d 513 (2016).

In this case, defendant complains about the use of leading questions, but he has not provided any specific citations to the record to establish the use of leading questions by the prosecutor. "Defendant may not leave it to this Court to search for a factual basis to sustain or reject his position." *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). And by failing to adequately brief the issue, defendant has abandoned his claim. See *People v Henry*, 315 Mich App 130, 149; 889 NW2d 1 (2016). Nevertheless, even if the issue is considered, defendant's argument is without merit.

Our review of the record shows that the trial court in fact sustained an objection to the prosecutor's use of leading questions and instructed the prosecutor to rephrase. Insofar as the trial court ruled in defendant's favor, even assuming the prosecutor's question was improper, defendant has already received relief, and he is not entitled to relief on appeal. See *People v Miller (After Remand)*, 211 Mich App 30, 42; 535 NW2d 518 (1995). However, it is also true that, at one point, the trial court indicated that leading questions would be "okay" to the extent necessary to elicit testimony about "the right time period for the charges." Insofar as the trial court approved the limited use of leading questions, it was not an abuse of discretion to allow leading questions as needed to develop the victim's testimony. See MRE 611(d)(1). Indeed, the victim was only 12 years old at the time of trial, and as already noted, "a considerable amount of leeway may be given to a prosecutor to ask leading questions of child witnesses." *Watson*, 245 Mich App at 587. Overall, the trial court's decisions regarding the use of leading questions were not an abuse of discretion. And, despite the prosecutor's use of leading questions, reversal is not required because defendant has not shown prejudice or a pattern of eliciting inadmissible testimony by the prosecutor's use of leading questions. See *Johnson*, 315 Mich App at 200.

Affirmed.

/s/ Jonathan Tukel
/s/ Michael F. Gadola