*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CURTIS LEE RICHARDSON III,

        Defendant-Appellant.

UNPUBLISHED
December 21, 2023

No. 360600
Saginaw Circuit Court
LC No. 17-043882-FC

Before: GLEICHER, C.J., and JANSEN and RICK, JJ.

PER CURIAM.

An all-white jury convicted Curtis Lee Richardson III of domestic violence and several other offenses. During jury selection, Richardson insisted that his trial counsel lodge an objection under *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), after the prosecution peremptorily challenged three black jurors. Counsel reluctantly complied with the request, and the trial court overruled the objection.

The parties agree that the prosecutor's challenge of three black jurors established a prima facie case of discrimination under *Batson*, and that the prosecutor offered race-neutral reasons for the jurors' dismissals. Step three of the *Batson* analysis required the trial court to consider whether the reasons for the challenges were pretextual— veiled excuses for purposeful discrimination. Our review of this decision is highly deferential. But even applying that standard, the trial court clearly erred by dismissing two of the black jurors.[1] We reverse and remand for a new trial.

---

[1] Given our decision, we do not discuss the second of the three black jurors stricken below. See *Snyder v Louisiana*, 552 US 472, 478; 128 S Ct 1203; 170 L Ed 2d 175 (2008).

## I. FACTUAL BACKGROUND

Because the *Batson* issue is dispositive, we need not recap the trial evidence. We instead focus on the voir dire, the statements made by the prosecutor in response to the *Batson* challenge, and the trial court's ruling.

The prosecutor peremptorily challenged three black jurors, and the trial court upheld the strikes. Even a single peremptory strike exercised based on race requires reversal. See *Snyder v Louisiana*, 552 US 472, 478; 128 S Ct 1203; 170 L Ed 2d 175 (2008) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose") (quotation marks and citation omitted; alteration in original); see also *JEB v Alabama ex rel TB*, 511 US 127, 142 n 13; 114 S Ct 1419; 128 L Ed 2d 89 (1994) ("The exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system.").

After Richardson's jury was selected but before it was sworn, defense counsel raised a half-hearted *Batson* challenge, stating:

> My client has asked me to make a challenge to the array under [*Batson*], I believe it's a Supreme Court case, for the reason that what we're left with is an all-white jury. My client is African American.
>
> As we went through the challenges, I believe the prosecution challenged, using peremptory challenges, three African-Americans. I don't believe I challenged any. I did challenge Mrs. Gomez who I think is Hispanic, but, you know, it would appear, at least to my client, there's a systematic effort to exclude blacks from the jury, so we would raise an objection to this jury and a challenge under [*Batson*]. Thank you.

The prosecutor responded by defending his three peremptory challenges of black jurors. Regarding the first challenged juror, DC, the prosecutor explained:

> It was actually brought to my attention by my officer in charge and then I observed it myself that she was just kind of looking down, may have appeared to doze off. I know that when the Court advised her that she had been challenged, she was a little bit—she seemed to be a little bit startled, so I want attentive jurors.

The prosecutor also challenged juror SP, describing his reasoning as follows:

> With respect to [SP], at that point, it just was a question of demeanor. It was a question of some the answers that she gave with respect to prior jury service,

not really [having] any memory of it. There were a number of things that went into the calculation. Race was definitely one of them.[2]

* * *

So race did not come into it. I did not—and having done this for 36 years, I do not systematically exclude anybody from jury service based on their race or their gender or whatever preferences they may or may not have.

Questioned further by the trial court, the prosecutor expanded on his explanation for challenging SP as follows:

*The Court*: I just want to follow up on [SP]. I'm not clear as to the non-discriminatory reason set forth. You said demeanor.

[*The Prosecutor*]: That was one of many, your Honor, again, her answers to my questions, and I focused on the jury service. She seemed to be—again, I don't know the woman so I don't want to speculate. I perceived a little bit of stand-offishness, but, again, and that's not really fair to her because I don't know the woman. It was just—it was a perception. It had nothing to do with the color of her skin whatsoever, and to the extent that I almost resent the accusation.

The trial court heard more argument on the *Batson* challenges the next day. After reviewing the *Batson*'s "three-step process" for evaluating *Batson* challenges, the court questioned the prosecutor, Dan VanNorman, as follows:

. . . I'd like to inquire further of Mr. VanNorman as to [DC], [for] who[m] I reviewed the transcript or portions of the transcript, and found that she did not— I don't believe she was asked any questions nor did she make any statements prior to your dismissal of her as a peremptory challenge. You did state on the record as evidence that she may not be paying attention, that she was startled when her name was spoken, but that was at the time that you were challenging her on your peremptory, so I'm looking for some evidence.

I think you put on the record that she wasn't paying attention, but I—and let me say this for the record. I did not watch her intently during the voir dire[,] so the Court doesn't have any firsthand knowledge of whether she was paying attention or the like. So, with that, I'll turn it over to Mr. VanNorman and have you tell me, if you can, precisely why you dismissed [DC] based on the reasons you set forth yesterday.

---

[2] We agree with the prosecution that it is unlikely that the prosecutor stated that race "was definitely" one of the reasons he excused SP. We assume that either the transcript is in error, or the prosecutor misspoke.

The prosecutor responded:

> Certainly, your Honor. I did have—as the Court is aware, I'm assisted by an officer in charge. . . .
>
> Detective Yant has been an officer for a number of years, has sat on, I believe, a number of jury trials . . . . She—while I'm doing certain things in the courtroom as far as questioning jurors or maybe observing jurors, listening to the Court, or whatever, she takes time on occasion to observe the jurors. At least that's—and that's my understanding and my experience with most officers in charge.
>
> She had indicated to me that Juror Number 1, [DC], wasn't showing any emotion, just wasn't paying attention, frequently closed her eyes to the extent that Detective Yant came to the—considered the possibility, at the very least, that she may have been dozing off or falling asleep.
>
> In consulting with the detective, and, again, I believe I have the right to consult with the officer in charge in this, I take her at her word, and that was my reason for excluding that juror.

The court then consulted defense counsel regarding his observations of DC; he stated:

> I would just state that [DC] in Seat 1, I didn't observe her dozing off or anything. I've had a lot of trials and I have had cases during voir dire where people's heads have fallen on their chest or been snoring and different things like that. I didn't see anything like that from [DC], so I'll leave it to the Court's discretion based on Officer Yant's recollection.

Defense counsel conceded that DC could have dozed off, but he was focused elsewhere during voir dire.

> The court resolved the challenge to DC as follows:
>
> Let's walk through the explanations provided by the prosecution . . . . [The prosecutor asserts that DC] did not seem to be paying attention. I, the Court, did not witness that. I did certainly witness her being startled. And let me also say my memory is not that it was startled like [she was] very closely paying attention. It was more of a—I believe her head was down and she kind of jerked her head up when she—when she—when her name was called. That, in and of itself, I don't think is credible as to the fact that she wasn't paying attention.
>
> However, when you couple it with the fact that Miss Yant described what Mr. VanNorman described here on the record, it does—at least it does show that that is a possible and probable result. In other words, if someone isn't paying attention, it's very plausible that someone dozing off, so to speak, or looking like their head's bobbing gives that credence, so I don't believe there is a pretext.

-4-

I offered an opportunity for [defense counsel]. He just simply said he didn't see that, which is fine, but I don't think—I don't think there is a pretext there. The Court makes such a finding.

The court then turned to SP, recounting that the prosecutor based his challenge to this juror on "the fact that [SP] had somewhat of a poor memory when trying to harken back to her service as a juror in Wayne County," which the prosecution described earlier as raising a question concerning SP's demeanor.

Relevant to the challenge of SP, the trial court conducted the initial voir dire, which included asking the jurors if they had any previous jury service. SP answered affirmatively and engaged in the following colloquy with the court:

[*SP*]: Yeah, about 10 years ago [I served] in Wayne County. I don't remember—

*The Court*: Well, we are in Saginaw County.

[*SP*]: Yeah.

*The Court*: We are better. Right?

[*SP*]: No.

*The Court*: To my colleagues in Wayne County, I'm just teasing. Anything about that experience that left a bad taste in your mouth or would cause you to have a problem serving?

[*SP*]: No.

The prosecutor followed up by confirming that SP sat on a jury "about 10 years ago." The prosecutor asked, "Was it a civil or criminal?" SP responded, "I don't remember." The questioning continued as follows:

[*The Prosecutor*]: Is it safe to say if you don't remember that, you might not remember what the verdict was or if it went to a verdict?

[*SP*]: It went to a verdict but I don't remember.

SP was not asked any additional questions.

The trial court resolved the *Batson* challenge regarding SP as follows:

Mr. VanNorman [the prosecutor] stated on the record yesterday that . . . his non-discriminatory reason for excusing [SP] had to do with the fact that she had somewhat of a poor memory when trying to harken back to her service as a juror in Wayne County. She did know that there was a verdict but she didn't know what the verdict was. I reviewed the transcript of the voir dire and not only is what Mr.

VanNorman saying accurate, I also had the occasion to look at a different point in the voir dire with the Court where she stated that it was ten years ago that she was on a jury in Wayne County.

So I think if you add up all those facts she didn't even—not only did she not know the verdict, which, in and of itself I don't find persuasive—in fact, I know that defense is the one party that dismissed [another juror, NE].[3]   If we all remember right, I believe [NE] was on a jury a long time ago and didn't seem to remember too much about that.  However, when I looked back and see that [SP] stated to the Court that she was on the jury 10 years ago, first of all, there is a substantial difference between 10 years and 22 years, interestingly, 22 years being a more precise number.

I can certainly understand the prosecution's concern with a prospective juror that, number one, didn't—maybe didn't know a verdict from 20 or so years ago, which, again, in and of itself isn't persuasive to the Court, but, yet, finding [that SP] *doesn't even know whether she served 10 years ago could potentially indicate a memory problem*, so I find that there is a non-discriminatory reason. (Emphasis added).

Contrary to the trial court's recapitulation, SP *did* remember that she served on a jury "about 10 years ago," and that the jury reached a verdict.  She did not recall whether the case was civil or criminal, or what the verdict was.  The court's memory of its "comparator" juror, NE, was also flawed, as this excerpt from voir dire demonstrates:

> [*NE*]:  I serve[d] on a jury.  It's been a long time, about 20 years ago.  I think I went with a trial.  I don't really remember.  I was here and I think we went through the trial.  It was about a car accident.
>
> *The Court*:  Okay.  So it could be that it was civil?
>
> [*NE*]:  Yeah, I'm not sure.  It was quite some time ago.
>
> *The Court*:  Either way, do you remember the verdict?
>
> [*NE*]:  I don't.

Contrary to the trial court's recollection, juror NE never used the number "22."  She also was unsure whether the prior case was civil, and did not "really remember" whether the case even went to trial—nor the verdict.  Her memory of her jury service was not appreciably better than that of SP.

---

[3] Defense counsel sought to exclude NE from the jury, which the trial court allowed.  No justification for this exclusion is apparent from the record.

## II. ANALYSIS

### A. *BATSON*

A *Batson* objection triggers a three-step inquiry intended to determine whether discrimination motivated a peremptory challenge. Once a defendant establishes a prima facie case of racial discrimination, the burden shifts to the prosecutor to offer race-neutral explanations for the challenged strikes. *Batson*, 476 US at 97.[4] The next step is not onerous.

> The second step of this process does not demand an explanation that is persuasive, or even plausible. At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. [*Purkett v Elem*, 514 US 765, 767–68; 115 S Ct 1769; 131 L Ed 2d 834 (1995) (quotation marks and citation omitted; alteration in original).]

At the third step, the trial court resolves the challenge by determining whether the defendant has established purposeful discrimination. *Batson*, 476 US at 98. We review the trial court's ruling regarding the third step for clear error. *People v Kabongo*, 507 Mich 78, 91-92; 968 NW2d 264 (2021). "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

At *Batson*'s second step, the prosecutor offered facially neutral reasons for the strikes of jurors DC and SP. According to the prosecutor, DC "may have appeared to doze off," and she "was a little bit—she seemed to be a little bit startled" when peremptorily challenged. Regarding SP, the prosecutor explained: " . . . [I]t just was a question of demeanor. It was a question of some of the answers that she gave with respect to prior jury service, not really [having] any memory of it. There were a number of things that went into the calculation. . . . ." The prosecutor elaborated that SP's demeanor "was one of many" nondiscriminatory reasons justifying the challenge, and that she appeared "a little bit . . . stand-offish[]" during questioning.

The prosecutor's explanations for striking DC and SP share a common thread. As to both, he invoked the jurors' "demeanor." When the prosecutor's race-neutral reason for striking a minority juror is rooted in the juror's demeanor during voir dire interrogation, the trial court must evaluate "not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder v Louisiana*, 552 US 472, 477; 128 S Ct 1203; 170 L Ed 2d 175 (2008). This question is inherently factual, and "the trial court's firsthand observations" are critical, *id*.

---

[4] Because the trial court ruled on "the ultimate question of intentional discrimination," we need not consider *Batson*'s first step. See *Hernandez v New York*, 500 US 352, 359; 111 S Ct 1859; 114 L Ed 2d 395 (1991).

This Court has emphasized that "[w]hen a prosecutor's sole explanation for a strike resides in a juror's appearance or behavior, the third step bears heightened significance," *People v Tennille*, 315 Mich App 51, 65; 888 NW2d 278 (2016), because explanations for peremptory challenges rooted solely in a juror's demeanor "are particularly susceptible to serving as pretexts for discrimination[,]" *id*. (quotation marks and citation omitted).. "Nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike. For that reason, trial courts must carefully examine such rationales." *Id*. (quotation marks and citation omitted). "[B]ecause such after-the-fact rationalizations are susceptible to abuse, a prosecutor's reason for discharge bottomed on demeanor evidence deserves particularly careful scrutiny." *Id*. (quotation marks and citation omitted; alteration in original).

*Snyder*, 522 US 472, provides additional guidance regarding *Batson*'s step-three evaluation when a juror's demeanor is a purported basis for a peremptory strike. *Snyder*, too, involved a peremptory challenge based on a prospective juror's demeanor. The prosecutor explained that the challenged juror, Jeffrey Brooks, " 'looked very nervous to me throughout the questioning,' " adding that jury service might cause him to miss a college commitment and prompt a swift not-guilty verdict. *Id*. at 478. Defense counsel disputed both reasons, and the trial court ruled, " 'All right. I'm going [to] allow the challenge[.]' " *Id*. at 479.

The United States Supreme Court determined that the prosecutor's reliance on Brooks's college commitments was "highly speculative," "suspicious," and "implausib[le]." *Id*. at 482-483. As to his "nervousness," the Court observed that " 'nervousness cannot be shown from a cold transcript,' " and the trial court record "does not show that the trial judge actually made a determination concerning Brooks'[s] demeanor." *Id*. at 479. Notably, the Court acknowledged that "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance." *Id*. at 477. "In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id*. "[D]eference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on [a juror's] demeanor in exercising a strike." *Id*. at 479.

In applying those guidelines in *Snyder*, the Supreme Court reasoned as follows:

Here, . . . the record does not show that the trial judge actually made a determination concerning Mr. Brooks'[s] demeanor. The trial judge was given two explanations for the strike. Rather than making a specific finding on the record concerning Mr. Brooks'[s] demeanor, the trial judge simply allowed the challenge without explanation. It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks'[s] demeanor. Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned. Thus, the trial judge may not have recalled Mr. Brooks'[s] demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks'[s] demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous. [*Id*. at 479.]

Because the prosecutor's second reason for striking Brooks was pretextual, the Court refused to presume based on an empty record that the prosecutor's first reason—Mr. Brook's nervousness— merited automatic acceptance. The Court summarized: "in light of the circumstances here[,] . . . the record does not show that the prosecution would have pre-emptively challenged Mr. Brooks based on his nervousness alone." *Id*. at 485.

Here, the trial court made no independent findings whatsoever regarding the demeanors of either SP or DC. On this cold record, "we cannot presume that the trial judge credited the prosecutor's assertion" that some aspect of these two jurors' demeanors supplied a race-neutral reason for the strikes. *Id*. at 479.

The validity of the prosecutor's challenge of DC rests instead on whether the trial court properly concluded that the prosecutor's reason for her dismissal— dozing off and not paying attention—was not a pretext for discrimination. "The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Id.* at 477. Here, however, the trial court forthrightly admitted that it did not observe DC "dozing," and neither did defense counsel. Although the court saw that DC was "startled," the court expressed that "in and of itself, I don't think [the started reaction] is credible as to the fact that she wasn't paying attention." Instead, the court relied solely on the alleged observation of the prosecution's officer in charge, "Detective Yant," an obviously interested participant. Instead of making any independent findings, the court bootstrapped Yant's perception into its analysis, finding that combined with DC's startled reaction when challenged, "it's very plausible that someone dozing off, so to speak, or looking like their head's bobbing gives . . . credence" to the prosecutor's nondiscriminatory explanation of the strike. In other words, the trial court accepted as true a finding made by the officer in charge—that DC appeared to have dozed off during jury selection.[5]

However, "[when] conducting a *Batson* analysis, a court may not simply 'accept' a prosecutor's race-neutral explanation and terminate the inquiry there." *Tennille*, 315 Mich App at 68. "When demeanor serves as the sole ground for dismissal, some indication of whether the court

---

[5] For most jurors, jury selection is not the most interesting part of a jury trial. Even for lawyers, the voir dire is often tedious. That a juror may have dozed off or closed his or her eyes during jury selection says very little about the juror's ability to pay attention during a trial. Moreover, as the trial court correctly noted, neither it nor the prosecutor asked DC a single question—and she never interjected with any statements of her own—during voir dire. The prosecutor's failure to question this juror to attempt to ascertain her level of attention supports our conclusion that the strike of DC was racially motivated. See, e.g., *Miller-El v Dretke*, 545 US 231, 250 n 8; 125 S Ct 2317; 162 L Ed 2d 196 (2005) (" . . . the failure to ask undermines the persuasiveness of the claimed [nondiscriminatory] concern."), and *United States v Odeneal*, 517 F3d 406, 420–21 (CA 6, 2008), quoting *Dretke*, 545 US at 244 ("Moreover, had the prosecutor been truly concerned about juror 194's ability to focus on the proceedings because of her divorce, 'we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.' ").

observed the alleged expressions is required." *Id*. at 69. "If the court did not see the expressions, it must nonetheless find facts that either support or refute that racial discrimination motivated the challenge. This fact-finding hinges largely on credibility." *Id*.

Here, the trial court found no facts justifying the strike of DC; it merely accepted the prosecutor's purported reasoning. See *id*. ("This record lacks any *objective* indicia of the prosecutor's credibility regarding the extent of the jurors' reactions or the manner in which they compared to the reactions of other jurors. The absence of factual findings in this regard is compelling evidence that the trial court short-circuited the *Batson* process by failing to subject the prosecutor's demeanor claim to a dispassionate evaluation.") (emphasis added). By failing to make an independent factual determination and instead relying on an observation allegedly made by an interested officer in charge of the case, the trial court here, as in *Tennille*, "short-circuited the *Batson* process by failing to subject the prosecutor's demeanor claim to a dispassionate evaluation." *Id*. The prosecutor's failure to ask juror DC a single question testing her level of attentiveness is also telling evidence of the prosecutor's motivation for striking DC. Without questioning DC, the prosecutor had no objective basis for determining her level of attentiveness to the proceedings.

We reiterate that our review of the trial court's decision is highly deferential. But that does not mean we must rubber stamp a non-finding, or even a finding predicated on hearsay offered by an interested witness. Because the trial court admitted that it never saw DC dozing and the only "evidence" of this fact was provided by an unsworn and partisan on-looker, the trial court clearly erred by upholding this strike. A remand for fact-finding regarding this juror would be pointless, as nearly five years have passed since Richardson's trial, and even at the time, no one except Yant claimed to have seen DC dozing.

The prosecutor offered a related reason for striking juror SP: "With respect to [SP], at that point, it was just a question of demeanor. It was a question of some the answers that she gave with respect to prior jury service, not really any memory of it. There were a number of things that went into the calculation." For the reasons discussed above, the prosecutor's reliance on this juror's demeanor, without more, does not cleanse the reason for the strike from pretext. The trial court correctly refrained from relying on the prosecutor's demeanor rationale, and instead focused on SP's memory, characterizing the prosecution's nondiscriminatory basis for striking SP as "that she had somewhat of a poor memory when trying to harken back to her service as a juror in Wayne County." The court continued, "She did know that there was a verdict but she didn't know what the verdict was."

Regardless of the similarities and differences between SP's and NE's answers to questions about their previous jury service and their apparent lack of a clear memory of their service, neither the trial court nor the prosecutor explained how SP's poor memory of jury service a decade ago was relevant to her participation as a juror in Richardson's case. Richardson's trial started and finished within four days. The evidence portion consumed less than two full days. The trial's brief duration was not a surprise to anyone; the prosecution's witness list was short.

*Batson* requires "[t]he prosecutor . . . [to] articulate a neutral explanation related to *the particular case to be tried*." 476 U S at 97 (emphasis added). A juror's potential inability to remember and synthesize information elicited during a long trial would be a legitimate and

-10-

nondiscriminatory ground for a peremptory challenge. Here, however, we are mystified as to why SP's failure to remember the specific details of her jury service from 10 years ago had any bearing on her ability to remember two days of trial evidence. More importantly, neither the prosecution nor the trial court made any effort to explain the link between SP's poor memory of her previous jury service a decade prior and her ability to decide the case at hand. See *Zakour v UT Med Group, Inc*, 215 SW3d 763, 771 (Tenn, 2007) (" . . . [T]he Defendants did not explain how Ms. Frazier's lack of memory regarding the outcome of a previous jury case was relevant to her participation as a juror in this trial."). And once again, a remand for more fact-finding regarding this strike is pointless, as the reasons given by the prosecutor inadequately supported striking SP.

Because the prosecution's race-neutral reasons for the strikes of SP and DC either were not credited or should not have been credited by the trial court, we must reverse Richardson's convictions and order a new trial.

## B. ADDITIONAL GROUNDS FOR A NEW TRIAL

Although the *Baston* issue resolves this case, Richardson also contends that the prosecutor's closing argument deprived him of a fair trial. We briefly address this argument to highlight that the prosecutor improperly invoked the jury's sympathy during closing arguments. However, this error did not deprive Richardson of a fair trial.[6]

As relevant here, the prosecutor argued as follows regarding the domestic violence charge:

> Then we get to Count III, domestic violence, third offense. We stipulated and we read to you, I think at the beginning or when we presented to you, maybe even before openings, that [Richardson] had agreed that he has two prior domestic violence convictions, and these aren't ancient. These aren't like from the '80s, or whatever; 2011 to 2013. Okay? So within the last—well, less than 10 years. He knows what it's like to be through that system and he knows how to take care of his women.

> And in this situation, did he assault [the victim]? Well, listen to the instructions carefully. The answer is yes. Not only did he assault her, he battered her. He ripped her clothes off. He left her for a moment in that room topless, bare-breasted, and maybe not embarrassed because apparently they had that kind of relationship in the past, but, still, I can't—it's never happened to me. I can't comprehend.

> And I know there was—there were some of you—I think all of you—I don't know if any of you that stayed in the box, but some of the prospective jurors had been through that before. Imagine the violation that anybody feels when somebody who thinks he's got all the power says or does—he didn't say a word. He just

---

[6] Given our resolution of the *Baston* issue, we need not, and do not, address Richardson's remaining arguments, including his other claims of prosecutorial error and his claims of ineffective assistance of counsel.

ripped her shirt off, ripped her clothes off. I can't comprehend. *I can tell you I have two daughters, and that's as far as I'll take it because I think you know the rest of what I would say if anybody did that to a daughter of mine.*

So yes, he committed domestic violence and he committed it, as has been discussed and agreed to, at least—not agreed to. Whether it happened this time is disputed but he's done it in the past. So domestic violence, third offense, guilty. [Emphasis added.]

We review claims of prosecutorial misconduct de novo to determine whether a defendant was deprived of a fair and impartial trial. *People v Caddell*, 332 Mich App 27, 71; 955 NW2d 488 (2020). "Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *Id*. (quotation marks and citation omitted).

However, because Richardson did not object to the prosecutor's allegedly objectionable comments, this issue is unpreserved, and therefore reviewed for plain error affecting Richardson's substantial rights. *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021). Under the plain error rule, a "clear or obvious" error must have occurred, and the error must have "affected substantial rights," generally meaning that "the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). If the three elements of the plain error rule are established, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and citation omitted; alteration in original).

A prosecutor may not "inject issues into a trial that are broader than the defendant's guilt or innocence" by "invit[ing] jurors to suspend their powers of judgment and decide the case on the basis of sympathy or civic duty." *People v Lane*, 308 Mich App 38, 66; 862 NW2d 446 (2014). Nevertheless, "[t]he prosecution has wide latitude in arguing the facts and reasonable inferences [therefrom], and need not confine argument to the blandest possible terms." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007). Prosecutors may not urge the jury to sympathize with a victim, but doing so will not warrant reversal if the prosecutor's commentary was not blatant and the jury was properly instructed not to be influenced by sympathy or prejudice. *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001) ("Appeals to the jury to sympathize with the victim constitute improper argument," but reversal is not required if a prosecutor's comment is isolated, not a blatant appeal for sympathy, and "not so inflammatory as to prejudice defendant."). In *Watson*, this Court held that it was not excessively inflammatory for the prosecutor to argue that the defendant "treated [the victim] in a way that no animal should be treated," whereas "repeatedly referring to 'the poor innocent baby' " was impermissible. *Id*. at 591 (quotation marks and citation omitted).

Here, the prosecutor's comment about his own daughters, and his effort to convince the jurors to consider their personal experiences, improperly invited jurors to inject their own sympathy for the victim in determining Richardson's guilt. Although isolated, the prosecutor's commentary was unrelated to the facts in evidence or any reasonable inference therefrom. Nevertheless, the prosecutor's commentary was neither repeated nor excessively inflammatory,

and the reference to the jurors' own traumas was vague. And juries are presumed to follow instructions "to decide the case based solely on the evidence and not to render a decision based on sympathy or bias." *People v Johnson*, 315 Mich App 163, 191-192; 889 NW2d 513 (2016). The jury was properly instructed that it had "taken an oath to return a true and just verdict based only on the evidence and [the trial court's] instructions on the law" and "must not let sympathy or prejudice influence [its] decision." For these reasons, the prosecutor's improper commentary does not warrant reversal.

We reverse and remand for a new trial. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Michelle M. Rick