*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 28, 2025
10:11 AM

Plaintiff-Appellee,

v

No. 365697
Genesee Circuit Court
LC No. 2021-048234-FC

MYAJA SHABREE SIMPSON,

Defendant-Appellant.

Before: BORRELLO, P.J., and RIORDAN and PATEL, JJ.

PER CURIAM.

Defendant was convicted, following a jury trial, of second-degree murder, MCL 750.317. She was sentenced to serve 25 to 50 years' imprisonment. We affirm.

## I. FACTUAL BACKGROUND

Defendant's conviction arises from the murder of David Scott, Jr.

Defendant and Scott lived together at the time of the incident and had been in a relationship for three years but, according to defendant, she had recently broken up with Scott. On the day of the incident, when Scott was gone, John McCree, his children, and defendant's sister and her children were at defendant's house for the day. Scott was at his cousin Cortez Flynn's house when defendant called him multiple times, telling him to bring her belongings back. Eventually, Scott went to defendant's house, and an altercation occurred. Scott left with a single stab wound to his chest. Defendant called McCree via FaceTime video call to ask him to come back over, and she appeared injured on the call. On his way back, McCree saw Scott's car in the ditch, tried to assist Scott, and called the police. Scott died in his car while McCree was waiting for the police to arrive.

When the police arrived at defendant's house, she appeared dazed and was picking up broken parts of a mirror. She had placed four steak knives in a trash bag as well. The detective in charge, Detective Laurie Salem, noted that defendant appeared to have been in an altercation because she had a hole in her shirt, small cuts on her face, and a fresh scrape on her elbow. Defendant admitted to the detective that she had stabbed Scott once, but she claimed that she only was trying to "scare" Scott.

At trial, the prosecution theorized that defendant had lured Scott over to her house with the intent to kill him. Defense counsel argued that she acted in self-defense. The jury returned a verdict of guilty of second-degree murder, rejecting charges of first-degree murder and manslaughter, as well as defendant's theory of self-defense.

## II. *BATSON* CHALLENGE

Defendant first argues that the trial court erred when it denied her *Batson* challenge because the reasons given by the prosecution for its use of a peremptory challenge to dismiss a black juror were merely pretextual, and because the trial court improperly considered actions that occurred after the challenge and the overall composition of the jury pool and jury itself. We disagree.

When reviewing a *Batson* challenge,

the proper standard of review depends on which *Batson* step is before us. If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error. [*Estate of Carlsen by Carlsen v Southwest Mich Emergency Servs, PC*, 338 Mich App 678, 688; 980 NW2d 785 (2021) (quotation marks and citation omitted).]

"Under the Equal Protection Clause of the Fourteenth Amendment, a party may not exercise a peremptory challenge to remove a prospective juror solely on the basis of the person's race." *People v Knight*, 473 Mich 324, 335; 701 NW2d 715 (2005) (footnote omitted). "[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v Mississippi*, 588 US 284, 311; 139 S Ct 2228; 204 L Ed 2d 638 (2019). When a *Batson* challenge is raised, the trial court must conduct a three-step process to determine if purposeful discrimination motivated the strike. *People v Tennille*, 315 Mich App 51, 55-56; 888 NW2d 278 (2016). First, the defendant must establish a prima facie case of racial discrimination. *Id*. at 56. Once shown, the burden shifts to the prosecution to offer race-neutral explanations for the strike, and the defendant may then argue why the offered reasons are pretextual. *Id*. "The trial court then resolves the challenge by determining whether the defendant has established purposeful discrimination." *Id*.

In this case, the parties do not dispute that defendant made a prima facie showing of racial discrimination or that the prosecution offered an explanation for the strike that was not discriminatory on its face. Thus, the issue before us is whether the trial court correctly resolved the third step in favor of the prosecution. "In making a finding at step three, the trial court is required to assess the plausibility of the race-neutral explanation 'in light of *all* evidence with a bearing on it.' " *Id.* at 64, quoting *Miller-El v Dretke*, 545 US 231, 236; 125 S Ct 2317; 162 L Ed

2d 196 (2005). Defendant "bears the burden of persuading the court that the prosecutor purposefully discriminated when exercising the strike." *Tennille*, 315 Mich App at 68.

"Nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike. For that reason, trial courts must carefully examine such rationales." *Id.* at 65 (quotation marks and citation omitted). "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v Cockrell*, 537 US 322, 339; 123 S Ct 1029; 154 L Ed 2d 931 (2003).

Here, defense counsel raised a *Batson* challenge during voir dire when the prosecution used a peremptory challenge to dismiss a black woman from the jury after dismissing two other black women. Defendant argues that the initial reasons given by the prosecution were inaccurate and that the prosecution subsequently changed its rationalization for the strike. Defendant notes that although the prosecution had originally stated, during an in-chambers conference, that the juror had three children, the juror subsequently was questioned by the trial court and stated that she had no children. From the record, however, it appears that the juror had indicated in her juror questionnaire that she had three children. In other words, at the time the prosecution dismissed the juror in question, it appeared that the juror had three children. The trial court did not clearly err by finding that the prosecution's stated reason for the dismissal, the difficulty with child-care issues over a multiday trial, was not pretextual.[1]

The prosecution also indicated that the juror was falling asleep during voir dire and seemed to have difficulty paying attention to the proceedings. Defense counsel responded that he had been watching the jurors in great detail, and he did not see her "dozing off" or not paying attention. However, to the extent that the attorneys disagreed about whether the juror was falling asleep or failing to pay attention, resolving this disagreement was a credibility issue for the trial court. See *Cockrell*, 537 US at 339. We will not disturb that determination on appeal. See *Carlsen*, 338 Mich App at 688. Thus, the trial court did not clearly err by finding that the prosecution's second stated reason for dismissal, the juror's state of awareness, was not pretextual. See *id.*[2]

---

[1] After the prosecution first dismissed the juror and defendant maintained an off-the-record *Batson* objection, the trial court asked the juror whether she had three children, and the juror indicated that she had no children. Defendant implies that the prosecution, at that point, should have decided against dismissing the juror. However, once the juror informed the trial court that she did not have any children, it became apparent that the juror was dishonest either in her questionnaire or during voir dire. Thus, it was entirely reasonable for the prosecution to continue to request that the juror be dismissed.

[2] Defendant asserts that the prosecution's reliance on the juror's general demeanor and her demeanor after the peremptory strike were insufficient reasons for the dismissal. With regard to the juror's demeanor, the prosecution stated that it "didn't feel I got connected with her," and that during the follow-up questioning, "her attitude changed significantly" and she was "gonna not be pleasant." "When a prosecutor's *sole* explanation for a strike resides in a juror's appearance or behavior, the third step bears heightened significance." *Tennille*, 315 Mich App at 65 (emphasis

Finally, defendant argues that the trial court erred when it considered the jury pool and composition when it denied the *Batson* challenge. As defendant observes, a *Batson* challenge does not concern the ultimate composition of the jury, but rather concerns whether a racial group was systematically and intentionally excluded. *Knight*, 473 Mich at 351. Here, however, the trial court's statements about the jury pool and composition merely were observations, not reasons for denial of the *Batson* challenge. Specifically, the trial court's brief discussion about the jury pool and composition occurred before it recited and addressed the three *Batson* steps, which indicates that its discussion in this regard was not intended to be part of its *Batson* analysis.[3] Thus, relief is not warranted on this basis.

For these reasons, defendant failed to meet her burden of showing that the prosecution's race-neutral reasons for the peremptory challenge were pretextual, and the trial court did not err when it denied her *Batson* challenge.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that defense counsel failed to object to improper opinion testimony provided by Detective Salem and that she was prejudiced by this testimony. We agree that some of the testimony arguably was improper. However, defendant has failed to show that defense counsel's failure to object was not sound trial strategy, and defendant also has failed to show that there is a reasonable probability that if this testimony had not been admitted, there would have been a different outcome.

Generally, the determination of whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Findings of fact are reviewed for clear error, and legal questions are reviewed de novo. *Id.* "A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake." *Id.* at 227-228 (quotation marks and citation omitted). "Where the trial court has not conducted an evidentiary hearing, this Court's review is limited to mistakes apparent on the record." *People v Hughes*, 339 Mich App 99, 105; 981 NW2d 182 (2021) (quotation marks and citation omitted).

---

added). In this case, in contrast, the prosecution did not rely solely on the juror's demeanor in exercising its peremptory challenge, and the trial court properly considered the propriety of the juror's dismissal "in light of all evidence with a bearing on it." See *id.* at 64-65.

[3] As the trial court stated before beginning its *Batson* analysis:

> It is my habit to count up the number of African Americans in our pools, in my trials because it is regularly -- I mean, it just looks like a small number. Although percentage wise it is within the boundaries of the law. And in fact, today I was pleased to see that we had nine African Americans out there, out of the 65 people in the pool. *So, those are just some of the statistics that are in the back of my mind when we had our conversation in chambers.* [Emphasis added.]

The United States and Michigan Constitutions guarantee criminal defendants the right to the effective assistance of counsel. See *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). To establish a claim of ineffective assistance of counsel, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

There is a strong presumption that defense counsel provided effective assistance. *Strickland*, 466 US at 689. A reviewing court must entertain a range of possible reasons for defense counsel's act or omission. *Vaughn*, 491 Mich at 670. "[T]here are times when it is better not to object and to draw attention to an improper argument." *People v Ullah*, 216 Mich App 669, 685; 550 NW2d 568 (1996).

Defendant argues that three portions of Detective Salem's testimony were improper because they were in violation of MRE 701.[4] At the time of trial, MRE 701 provided:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

The testimony of a police officer is admissible as opinion testimony when it is based on the officer's perceptions and assists the jurors in determining a fact at issue. *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994).

The first portion of testimony at issue is Detective Salem's response to the prosecution's questioning regarding how many times defendant had called Scott:

> So, after [McCree] left her house, after her sister and kids and everybody was gone from her house, that's when she starts texting [Scott] to come over. You need to come over. She texts him—or text—she calls him 13 times back to back to back to back to back and this what [sic] [Flynn] also tells me is that [Scott] was receiving these phone calls, he's trying to play Call of Duty, and [defendant] is blowing up his phone. He puts it on speaker phone, [Flynn] can hear her, [defendant], telling him, pardon my mouth, get the fuck over here, I'm going to fucking kill you, blah, blah, blah, you need to bring my shit back, that kind of stuff, to the point where he's just picking it up, answering it, hanging it up, putting it to voice—I mean, it's she's just constant.

Detective Salem had first-hand knowledge of the call log and text messages, and her testimony about the calls would be helpful to assist the jury. See *id*. This testimony was

---

[4] MRE 701 was amended effective January 1, 2024. We apply the version in effect at the time of trial.

nevertheless arguably improper under MRE 701 because Detective Salem did not observe or have first-hand knowledge of the conversation that Flynn overheard.

The second portion of testimony at issue is Detective Salem's response to the prosecution's question whether Detective Salem had observed, from the phone records, any contact between Scott and defendant earlier in the day. Detective Salem testified:

> So after [McCree] left her house, which he testifying, [sic] I believe was around between 7:00 or 8:00 p.m. that night, that's when . . . some texts come back and forth between [defendant], that's when—10:00, she starts wanting him to come—[Scott] to come over to her house.

*  *  *

> Cause everybody is gone from her house so now she's alone and she wants him to come over to her house.

Defendant argues that the explanation that defendant wanted Scott to come over when they would be alone was not based on the interview with defendant or the text messages, but was Detective Salem's own conclusion. However, McCree already had testified that he left defendant's house at approximately 7:00 or 8:00 p.m., and the text messages that were admitted included defendant's message to Scott that "you need to bring me my phone." Thus, this portion of Detective Salem's testimony was proper under MRE 701 because she had first-hand knowledge of the information provided. In other words, Detective Salem had first-hand knowledge that defendant wanted Scott to come to her house when she was alone.

The final portion of testimony that defendant argues was improper is Detective Salem's response to the prosecution's question about whether there were any calls from Scott prior to his arrival at the house. Detective Salem testified that at about 8:00 p.m., Scott texted defendant, "I love you." Detective Salem further stated:

> I think at 10:00 she texts him back, texts [Scott] back and says you need to bring my shit, something like—to that effect and then [Scott] texts her back, keep on F—fucking with that N word that she was with. So, I think [Scott] finds out that she's been with [McCree] all day long and now he's mad at this point. So at 8:00 he was—he loved her and then at 10:03 or something like that he's mad because he knows [McCree's] been over there all day.

Detective Salem's testimony that "I think [Scott] finds out that she's been with [McCree] all day long and now he's mad at this point" constituted a conclusion that the jury was capable of making on its own. Thus, this testimony arguably was improper because it did not "assist" the jury. See *Daniel*, 207 Mich App at 57.

Nevertheless, we cannot conclude that defense counsel's failure to object to any of Detective Salem's challenged testimony fell below an objective standard of reasonableness. See *Trakhtenberg*, 493 Mich at 51. With regard to Detective Salem's testimony that defendant made threatening statements when she called Scott, Flynn already had testified to that effect. Thus, defense counsel may have decided that an objection to Detective Salem's testimony would draw

unnecessary attention to this testimony because, even if an objection was sustained, the substance of that testimony already was admitted and heard by the jury. See *Ullah*, 216 Mich App at 685. Further, Detective Salem's testimony that "I think [Scott] finds out that she's been with [McCree] all day long and now he's mad at this point" appears to support defendant's argument that she was acting in self-defense and that Scott attacked her because he was angry. Accordingly, it conceivably was a valid trial strategy to allow this testimony because the testimony supported defendant's theory of the case.

Moreover, defendant fails to show that there is a reasonable probability that, but for defense counsel's failure to object to the challenged testimony, there would have been a different outcome at trial. See *Strickland*, 466 US at 694. Defendant argues that Detective Salem's summarization and characterization of the evidence was critical to the case. However, the jury appears to have rejected the inference defendant argues was suggested by the testimony—that she lured Scott to come to her house with the intent of killing him—because the jury rejected the first-degree murder charge and instead convicted defendant of second-degree murder. Therefore, defendant has failed to establish prejudice arising from counsel's failure to object to Detective Salem's testimony. See *Trakhtenberg*, 493 Mich at 51.

## IV. SENTENCE

Defendant finally argues that her 25-year minimum sentence, which was at the top of the guidelines range, was disproportionate. Defendant also argues that the guidelines range of 180 to 300 months was "too wide." We disagree with both arguments.

Sentencing decisions are reviewed for an abuse of discretion. *People v Posey*, 512 Mich 317, 325; 1 NW3d 101 (2023) (opinion by BOLDEN, J.). In particular, "sentencing decisions must be reasonable, and . . . sentencing decisions are reviewed for an abuse of discretion by determining whether they violated the principle of proportionality." *Id.* "A trial court abuses its discretion if the imposed sentence is not 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Ventour*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363922); slip op at 7 (citation omitted).

"When a trial court sentences a defendant within the guidelines' recommended range, it creates a presumption that the sentence is proportionate." *Posey*, 512 Mich at 360. "However, unlike a mandate that an appellate court affirm a within-guidelines sentence, the presumption of proportionality may be overcome." *Id.* "[P]roportionality must be measured according to the offense and the offender, not according to the sentence's relationship to the guidelines." *Id.* at 356. "[T]he defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate[.]" *Id.* at 359. "An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). "[T]rial courts are not required to expressly or explicitly consider mitigating factors at sentencing." *People v Bailey*, 330 Mich App 41, 63; 944 NW2d 370 (2019).

Initially, defendant argues that her sentencing guidelines range was too broad, giving the trial court "unfettered discretion." However, "[t]he Michigan Constitution vests sentencing

authority in the Legislature." *Boykin*, 510 Mich at 183. Specifically, Const 1963, art 4, § 45 states that "[t]he legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences." Thus, the trial court here had the authority to sentence defendant within her properly calculated guidelines range.

More importantly, regarding defendant's argument that her sentence was disproportionate, the trial court addressed the circumstances of the offense and noted that defendant had chased Scott after she stabbed him. Defendant suggests that her sentence was disproportionate to the offense because the single stab wound does not show a "brutal attack," and because the killing was done under circumstances similar to self-defense or manslaughter. However, the trial court noted that the jury had rejected both the higher offense of first-degree murder and the lesser offense of manslaughter, as well as an outright acquittal that would have suggested its agreement with self-defense. Moreover, the act of chasing Scott after stabbing him arguably could be characterized as "brutal." The trial court was not required to consider mitigating factors, such as the altercation between defendant and Scott as described by defendant. See *Bailey*, 330 Mich App at 63. Nor was the trial court otherwise required to justify its within-guidelines sentence. *People v Posey (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 345491); slip op at 4 ("[T]here is nothing in *Posey* suggesting that a sentencing court needs to expressly explain why a within-guidelines sentence is reasonable and proportionate."). Finally, defendant has not identified any particular facts of this case, other than the allegation of self-defense that the jury rejected, to indicate that a typical 25-year sentence for murder is inappropriate. See *Posey*, 512 Mich at 359 ("[T]he defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate[.]").[5]

Accordingly, we affirm defendant's 25-year minimum sentence as reasonable and proportionate.

## V. CONCLUSION

There were no errors warranting relief. We affirm.

/s/ Stephen L. Borrello
/s/ Michael J. Riordan
/s/ Sima G. Patel

---

[5] The essence of defendant's argument regarding her sentence is that the trial court failed to expressly justify a sentence at the top of the guidelines range. However, as noted, an express justification is unnecessary when the sentence is within the guidelines range.